**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JONATHAN KAGAN-KANS, *Plaintiff*, v. DEPARTMENT OF JUSTICE, et al., *Defendants*. | Civil Action No. 17-1380 (ACR) |

**JOINT STATUS REPORT**

This case is a Freedom of Information Act (FOIA) suit brought by Plaintiff Jonathan Kagan-Kans against the Federal Bureau of Investigation (FBI) for records concerning the investigation and federal prosecution of several bank robberies and resultant homicide in Ohio.

At the June 29, 2026 premotion conference, the Court directed the FBI to review the remaining challenged documents and verify that they were "withheld or redacted properly." 6/29/06 Tr. at p. 5, lines 14-18. The Court further indicated that, once that review is complete, the FBI will submit the relevant unredacted pages for in-camera, ex parte review. *Id*. at p. 5, lines 4-16. Plaintiff provided Defendants' counsel an itemized list of the withholdings still at issue: 225 pages and one video withheld in full, and 117 pages released in part.[1] The FBI reviewed the

[1] Plaintiff identified the following list of withheld in full (WIF) pages as remaining at issue: Bates 145; 269; 270; 306-307; 366; 368-372; 388-389; 465-466; 477-481; 482-485; 607; 608; 682-683; 684-686; 912-914; 923; 970-971; 972-974; 1429; 1430; 1432-1450; 1451-1452; 1453-1456; 1520; 1521; 1580; 1603-1613; 1624-1632; 1634-1649; 1762; 1777-1778; 1786; 1789; 1818-1836; 1839-1854; 1857-1899; 1920-1949; 2004-2007; 2012-2015; 2017; 2031-2038; 2053-2066; 2067-2070; 2116; 2118; and 2119. Plaintiffs also identified the following pages of released in part (RIP) records: Bates 35; 38; 56; 91; 98; 116; 127; 131; 133; 136; 137; 140; 147-148; 158; 193; 194; 224; 232; 234; 244; 246; 275; 276; 305; 315; 317; 320; 327-328; 345; 346; 351-352; 355; 360; 363; 373-374; 383; 411; 454; 458-460; 463-464; 467; 505; 508; 510; 535; 537-538; 629; 681; 1083-1084; 1182; 1184-1187; 1331-1335; 1336; 1337; 1338-1339; 1341-1343; 1352; 1485; 1546; 1557; 1567; 1574; 1614; 1615; 1838; 1856; 1914-1915; 2020; 2021; 2027; 2030; 2039; 2040; 2041; 2042; 2043; 2045-2046; 2047; 2049; 2050; 2051-2052; 2078-2079; 2084; 2085; 2090-2098; and 2117.

challenged documents to verify they were "withheld or redacted properly." After review, and in a good-faith effort to resolve the remaining issues in this case, the FBI made the determination that it would release additional material, and it made a supplemental release to Plaintiff on October 23, 2026, wherein the FBI re-processed Bates pages 35, 38, 193, 305, 328, 388-389, 2045, 2078, and 2091-2092.[2] After its review and re-release, the FBI provided a DVD containing these records for in-camera, ex parte review on October 27, 2026, per the Court's August 26, 2026 Minute Order (granting an extension). *See* ECF No. 79; Minute Order (Aug. 26, 2026).

In addition to the review and provision of in-camera documents, the Court also ordered the FBI to conduct targeted, supplemental searches.[3] The results of those searches are outlined below in the Defendant's Position.

**Defendant's Position**:

1. Physical searches of the FBI's Cincinnati Field Office (CI) and Columbus Resident Agency (CRA), including desks, shelves, and common rooms. Tr. at 8-9.

On August 14, 2026, Defendants notified Plaintiff that the FBI had completed its physical searches of CI and CRA, with no findings.

2. Electronic Case File (ECF) "full-text" searches for the following materials:

The FBI notes that it cannot conduct an ECF "text search" because the ECF is an old function of a retired system. ECF was part of the FBI's legacy ACS system, which was replaced by Sentinel. While Sentinel does have the full-text search capability, the underlying investigation predated Sentinel. Because of that, any tapes or chain-of-custody forms would be legacy

[2] Bates 388-389 were previously WIF, but after reprocessing, they are now RIP.

[3] Additionally, Plaintiff requested an updated description for Bates 224, which Plaintiff alleges was inaccurate in the Vaughn Index. Defendants provided the following updated description: Bates 224 is an ACS printout, dated June 22, 2010, which *lists* several serials within file 91A-CI-74994. This list includes date, serial, type of document, who the document was "to" and who the document was "from." For example, "Missing" serial 2 is listed as LAB#050108001 dated January 8, 2005, document type 7-16, going to FBI LAB from Columbus, OH.

documents. However, the FBI already completed a complete review of the investigative file, including the 1A and 1C subfiles where the tapes and chain-of-custody forms would ordinarily be located, and they were not found. A full-text search of Sentinel would not produce different results, as the entire investigative file was manually reviewed. Plaintiff continues to misunderstand and misconstrue Defendant's searches and search capabilities, and as a good faith effort, beyond what a Sentinel search could provide, the FBI conducted the additional supplemental searches outlined below.

a. <u>One missing serial (91A-CI-74994 serial 2).</u> Tr. at 9-10.

Although it could not conduct an ECF "full-text" search, the FBI searched for serial 2 in the ways it was able. The FBI did not locate serial 2 in file 91A-CI-74994, it was not located in subsequent searches, and on October 13, 2020, the FBI's Lab Division personnel recorded the loss of serial 2 (although this notation was outside the time range of Plaintiff's request, and therefore not responsive to this request). Upon reviewing the Lab Division's notation, and based upon the description of serial 2, the FBI believes Bates 503, 2138, and 2147 to be copies of the "missing" serial 2. The FBI represents that it has exhausted all possible means to search via search terms and to search by conducting targeted and manual searches for serial 2.

b. <u>Chain of custody forms for 14 unaccounted-for mini audiotapes.</u> Tr. at 10-11.

Although the FBI could not conduct an ECF "full-text" search (see supra), it reached out to CI and CRA to conduct a manual search for chain of custody forms, which resulted in no findings. The FBI represents that it has exhausted all possible means to search via search terms and to search by conducting targeted and manual searches for the chain of custody forms.

3. <u>Contact the United States Attorney's Office for the Southern District of Ohio (S.D. Oh.) to determine if it has possession of the unaccounted-for mini audiotapes.</u> Tr. at 13.

As requested by the Court, Defendant requested S.D. Oh. to determine whether they are in possession of any unaccounted-for mini audiotapes. Defendant will advise this Court on the results of that search when S.D. Oh. completes its search.

The Court also ordered the FBI to provide the following items to Plaintiff:

1. <u>Crime scene reconstruction report.</u> Tr. at 11.

The FBI reports that it provided, in its Vaughn Index, the Bates pages it located containing the crime scene reconstruction information. The WIF pages can be located at Bates pages 1762; 1777-1778; 1786; 1789; 1818-1836; 1839-1854; 1857-1899; 2004-2007; 2012-2015; 2017; 2118; and 2119, and the RIP pages can be located at Bates 1838, 1856, and 2117. The FBI processed everything it located that pertains to the crime scene reconstruction report. The FBI represents that it has exhausted all possible means to search for the crime scene reconstruction report, and it has provided the segregable, non-exempt portions of those documents to Plaintiff.

2. <u>3D electronic model of the bank.</u> Tr. at 11-12.

Regarding the 3D electronic model of the bank, the FBI reports that it provided, in its Vaughn Index, the Bates pages it located containing the 3D electronic model of the bank. The WIF pages can be located at Bates 1920-1949; 2004-2007; 2012-2015; 2017; 2118 and 2119, and the WIF video of the 3D rendering of the bank can be located at Bates 2116.[4] As discussed in previous declarations, and consistent with the FBI's position throughout this litigation, providing unredacted versions of the three-dimensional reconstruction of a crime scene would allow individuals "to modify their behavior or taint evidence the FBI may later use or evaluate through

[4] The FBI notes that Bates 2018, which is WIF, is also a duplicate page to Bates 1613, which was also WIF pursuant to FOIA Exemption b7E-13.

this technique." Fourth Seidel Decl. ⁋ 110. This information is properly withheld pursuant to FOIA exemption 7E. Although the FBI was able to release some information due to the closure of the bank branch, the closure of a bank branch does not impact the withholding of an FBI technique or procedure that is repeatedly utilized by the FBI. The FBI represents that it has exhausted all possible means to search for the 3D electronic model of the bank, and it has provided the segregable, non-exempt portions of those documents to Plaintiff.

3. Unaccounted-for handwritten notes and working copies of FBI 302 reports. Tr. at 12.

The FBI did not locate handwritten notes or working copies of FBI 302 reports that were not already reviewed and processed for release. The FBI processed the segregable, non-exempt portions of the documents it located. For example, Bates 595-597 is a working copy of Bates 324-327 and Bates 632-635 is a working is a working copy of Bates 271-274. Working copies can also be located at Bates 593-594, 624, 681-688, and 739-740, etc. Handwritten notes can be located at Bates 3-5, 7-11, 13-16, 18-21, 127-131, 458-461, 463-464, 467, 477-485, 505-506, 508-509, 510, 535-539, 1182-1185, 1186-1187, 1341-1343, etc. The FBI represents that it has exhausted all possible means to search for handwritten notes and working copies of FBI 302 reports, and it has provided the segregable, non-exempt portions of those documents to Plaintiff.

4. Missing serials from the "zero file," file number 91-A-B-0. Tr. at 13-14.

Regarding the alleged "missing" serials from the "zero" file, FBI reports that a control or zero file generally houses files that are unrelated to one another, which is the case here. The FBI only processed the serial that was responsive to the Plaintiff's FOIA request. The other "missing" serials in that control/zero file are unrelated to the FOIA request at issue here, and as such, were not considered responsive, were not processed, and were not included on the Vaughn Index.

On October 16, 2026, the parties conducted a meet-and confer to discuss the supplemental searches conducted by the FBI. On October 19, 2026, Plaintiff provided Defendant's counsel with a memorandum containing five single-spaced pages of, what appears to be, discovery requests. In keeping with the Court's requests during the June 29, 2026 pre-motion conference, wherein the Court instructed both parties, "I want you guys to work this out without me having to deal with anymore declarations or anymore papers, okay?" and instructed the Plaintiff, "You're not going to just challenge every single thing he says, okay?" the Defendant is declining, at this juncture, to draft an eighth declaration or to prepare discovery responses replying to five single-spaced pages worth of discovery requests wherein the Plaintiff continues to challenge everything the FBI has provided. 6/29/06 Tr. at p. 16 lines 5-7, 17-18. Thus, the FBI has *repeatedly* provided responses to discovery-style questions, yet each response has resulted in new rounds of questions.

The FBI maintains it has, repeatedly, satisfied its burden of proving it has conducted reasonable searches, protected information pursuant to the FOIA, and released the segregable, non-exempt portions of records to Plaintiff, and it has provided the remaining documents to the Court for in-camera, ex parte review. [5]

To the extent Plaintiff seeks an admission from the FBI that pages it WIF are identical to

[5] The FBI submitted seven declarations (six of which were substantive and one of which was related to office closures during COVID-19) throughout the course of this litigation. The FBI also, in good faith, responded to dozens of multi-part discovery-style inquiries in an attempt to resolve this litigation, despite the fact that the "FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters" or to allow requesters to conduct "fishing expeditions" through agency files. *Assassination Archives & Rsch. Ctr. v. CIA*, 720 F. Supp. 217, 219 (D.D.C. 1989), aff'd in pertinent part, No. 89-5414, 1990 WL 123924 (D.C. Cir. Aug. 13, 1990) (per curiam); *accord Nurse v. Sec'y of the Air Force*, 231 F. Supp. 2d 323, 329 (D.D.C. 2002) (quoting *Assassination Archives & Rsch. Ctr.*, 720 F. Supp. at 219); *see, e.g., Bloeser v. DOJ*, 811 F. Supp. 2d 316, 321 (D.D.C. 2011) (reasoning that "[b]ecause 'FOIA' was not intended to reduce government agencies to full-time investigators on behalf of requesters, . . . [t]o the extent that plaintiff can identify documents which he believes exist in a particular office within [DOJ], such identifying information should have been included as part of his original FOIA request"); *Frank v. DOJ*, 941 F. Supp. 4, 5 (D.D.C. 1996) (stating that agency is not required to "dig out all the information that might exist, in whatever form or place it might be found, and to create a document that answers plaintiff's questions"); *Lamb v. IRS*, 871 F. Supp. 301, 304 (E.D. Mich. 1994) (finding requests outside the scope of FOIA when they require legal research, are unspecific, or seek answers to interrogatories).

pages the Plaintiff obtained through other means, the FBI provides that it cannot confirm or deny whether the pages are identical. To do so would present harms protected against by the applied FOIA exemptions. Plaintiff points to various documents in its possession in support of the idea that the FBI has publicly acknowledged the records it seeks, however the documents do not constitute an official acknowledgement by the FBI. The mere existence of unconfirmed information in the public is not enough to establish that an agency has acknowledged it. *Fitzgibbon v. CIA*, 911 F.2d 755, 758 (D.C. Cir. 1990). In, the information provided by Plaintiff does not appear to exist in the public. To show a prior official acknowledgement, the "information requested must already have been made public through an official and documented disclosure." *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) (citing *Fitzgibbon*, 911 F.2d at 765). Plaintiff asserts the documents were obtained by virtue of his representation of Daryl Lawrence in his capital post-conviction proceedings, which does not constitute a public release of information. Under the FOIA, a release to one is a release to all. If the FBI were to acquiesce to Plaintiff's request to make exempt documents available to them, by the very nature of a FOIA release, the documents would then become public. Plaintiff's argument to the contrary lacks a basis in the law.

The FBI has exhausted all possible targeted, search term, and manual means to search for responsive records, and it provided the segregable, non-exempt portions of those records to Plaintiff, in compliance with the FOIA and the Court's Order. The FBI reports that it now awaits its review of the Court's review of the October 27, 2026, in camera submission.

**<u>Plaintiff's Position</u>**:

### A. Plaintiff Continues to Make a Good-Faith Effort to Resolve Disputes and Voluntarily Withdraw Challenges, but Defendants Have Declined Plaintiff's Offer to Reduce the Number of Documents this Court Must Review *In Camera*

The parties conducted a meet-and-confer on July 30, 2026. One week prior to that meeting, Plaintiff provided Defendants' counsel an itemized list of the withholdings still at issue: 225 pages and one video withheld in full, and 117 pages released in part. Plaintiff also conducted an internal review of unredacted materials in his possession and provided Defendants' counsel with unredacted versions of 84 pages and one video that potentially correspond to descriptions of withheld records in the FBI's Vaughn Index.[6] Plaintiff offered to withdraw his challenges to those withholdings if the FBI confirms that the proffered records are identical to the corresponding withheld records. Following the meet-and-confer, Plaintiff conducted an additional internal review and identified 2 more pages (Bates 1914-1915) for which he may have unredacted counterparts and extended the same offer of withdrawal upon confirmation.

Through this status report, Defendants have informed Plaintiff that the FBI has rejected his proposal. Plaintiff respectfully submits that the FBI's rationale is difficult to understand. The records at issue consist primarily of sketches and photographs of the interior of a bank branch that no longer exists. *See* ECF No. 42-2 at ¶ 114. Indeed, Defendants previously agreed that, because the branch no longer exists, they could not withhold records relating to it on the ground that disclosure would reveal law-enforcement techniques or procedures. *See* ECF No. 41-1 at ¶ 101 n.45; ECF No. 41 at 22 n.4.[7] Defendants now contend that merely acknowledging the existence of those same records would harm the agency. They offer no explanation for this

---

[6] Plaintiff reasonably believes these unredacted records may correspond to: (1) WIF Bates pages 1818-1836; 1839-1854; 1857-1899; (2) RIP Bates pages 1838; 1856; and (3) WIF Bates video 2116.

[7] The citations adopt the pagination in the ECF-generated headers of the parties' filings.

apparent change in position.

Similarly, Defendants' contention that continued withholding is necessary to protect confidential law enforcement techniques under Exemption 7E is not credible. This exemption only protects *non-public* techniques and procedures. *Prop. of the People, Inc. v. DOJ*, 539 F. Supp. 3d 16, 28 (D.D.C. 2021). Yet, the FBI relies on 7(E) to withhold techniques like crime-scene ballistics trajectory rods, undercover operations, and Computer Analysis Response Team processes already in the public domain and that the FBI itself has publicly described. *See* ECF No. 48 at 23-30. Courts also have held that revealing law-enforcement techniques from a decades-old investigation does not threaten current operations, and the twenty-one-year-old investigation at issue here is no different. *Prop. of the People,* 539 F. Supp. 3d at 28-29.

Additionally, Defendants' position is particularly difficult to understand given their stated concern about public disclosure. If Defendants accepted Plaintiff's proposal, Plaintiff would withdraw his challenges, and the disputed records would no longer be subject to potential public disclosure. In other words, Plaintiff's proposal would achieve the very objective Defendants claim to be pursuing.

In any event, Plaintiff's proposal was designed to resolve a discrete category of disputes without further litigation, substantially reducing the number of records subject to *in camera* review and lessening the burden on the Court. Consistent with that objective, Plaintiff has repeatedly narrowed the case over the course of this litigation by voluntarily withdrawing challenges whenever unredacted comparator records in his possession made continued litigation unnecessary. The proposal concerning these 86 pages and one video reflected the same good-faith effort to streamline the proceedings.

**B. Defendants' Refusal to Informally Provide Basic Information About Its Supplemental Searches is Unnecessarily Prolonging this Litigation**

On October 16, 2026, the parties conducted a meet-and-confer primarily to discuss the adequacy of the FBI's supplemental searches. As Plaintiff noted during that meeting, many of the FBI's responses regarding its supplemental searches omitted basic facts about the search method, without which Plaintiff could not intelligently assess the adequacy of the FBI's searches. Crucially, at no time during the meeting, or at any time thereafter, did Defendants' counsel indicate that Plaintiff's questions about the searches were unreasonable or constitute improper attempts at obtaining discovery. That is because they were not. For example, Plaintiff asked Defendants to identify such basic information as the dates on which searches were conducted, the search terms it used, and the locations or records systems that were searched. These are standard details used to evaluate the adequacy of agency searches.

Contrary to Defendants' suggestion, Plaintiff is acutely mindful of the Court's instruction "to work this out without me having to deal with anymore declarations or anymore papers." Indeed, Plaintiff specifically informed Defendants that providing this information would likely obviate the need for further declarations by allowing Plaintiff to informally but meaningfully assess the adequacy of the FBI's searches. To be clear, Plaintiff is not seeking additional litigation, he is seeking a basis to avoid it. But what Plaintiff cannot do, however, is simply take the FBI at its word that no further avenues exist for locating the missing records. That is especially true given Defendants' refusal to provide even the most basic information necessary to verify that they conducted supplemental searches for certain missing records in compliance with the Court's June 29, 2026 Order. *See infra* at 13. Given the FBI's well-documented history of inaccurate and evolving representations in this case, *see* ECF No. 48 at 6-8 & ECF No. 48-1 (Fourth Declaration of George G. Kouros) at ¶¶ 29-142, Plaintiff respectfully submits that any

claim that all reasonable search efforts have been exhausted requires more than the FBI's say-so.

The FBI's handling of Plaintiff's request for full-text searches illustrates why Plaintiff cannot simply accept its assurances at face value. Plaintiff has been requesting full-text searches, rather than the FBI's preferred "index searches," since the outset of this litigation in 2017. *See* ECF No. 12 at 24. At the June 29 premotion conference, Plaintiff expressly requested full-text searches rather than index searches and explained the distinction between the two. The Court granted that request. Notably, Defendants did not object, contend that the request was infeasible, or disclose that the ECF database had allegedly been retired. *See* 6/29/06 Tr. at 11-12.

Only weeks later did Defendants inform Plaintiff that the FBI could not conduct full-text searches of its ECF database because that database had been retired. Yet the FBI knew that fact at the time of the June 29 conference and never disclosed it to either Plaintiff or the Court.[8] Had it done so, Plaintiff simply would have requested, and the Court could have ordered, full-text searches using the FBI's current database, Sentinel.[9] After all, Plaintiff's request, and the Court's order, concerned the method of searching, not any particular database.

Defendants nevertheless admit that they have not conducted a full-text search. Instead, they now rely on a rationale never presented at the premotion conference: because the underlying investigation predated Sentinel, any responsive tapes and chain-of-custody forms would be

---

[8] This explanation is particularly curious because the ECF database was apparently retired long before this lawsuit began. Publicly available FBI materials indicate that the FBI had already transitioned from ECF to Sentinel by at least 2014. *See* Monica E. Ryan, "Privacy Impact Assessment for the SENTINEL System," May 28, 2014, https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/freedom-of-information-privacy-act/department-of-justice-fbi-privacy-impact-assessments/sentinel. If so, the FBI has been aware throughout this litigation that ECF was no longer operational. Nevertheless, in years of briefing and meet-and-confer discussions, it never disclosed that fact. Instead, when Plaintiff previously requested full-text searches of ECF, the FBI argued only that such searches would be too burdensome, not that they were impossible because ECF had already been retired. *See* ECF No. 41 at 10; ECF No. 41-2 (Fourth Declaration of Michael G. Seidel) at ¶ 24.

[9] The Sentinel database has full-text search capabilities. *See Wright v. Fed. Bureau of Investigation,* No. CV 18-0687 (TSC), 2023 WL 6121872, at *5 (D.D.C. Sept. 19, 2023) (noting that FBI conducted "full text searches of Sentinel"); *Boundaoui v. FBI*, No. 17 C 4782, 2020 WL 5658704, at *7 n.7 (N.D. Ill. Sept. 23, 2020) (describing Sentinel as "the FBI's newer electronic case management system that allows for full-text searches.").

"legacy documents." Even setting aside that those are not the only categories of records the FBI was ordered to search for, this position is difficult to reconcile with the FBI's prior representations that physical searches were unnecessary because all of its investigative files had been electronically indexed in its Central Records System (CRS). *See* ECF No. 47-1 (Fifth Declaration of Michael G. Seidel) at ¶ 12 n.8, ¶ 20. Having previously justified its prior search methodology on that basis, the FBI cannot now invoke the age of the investigation as a reason to avoid the very search the Court ordered.

Likewise, the FBI cannot disregard this Court's order requiring a full-text electronic search of the investigative file by disclosing for the first time in this status report the view that a manual search is sufficient. Plaintiff specifically requested full-text searches, the Court granted that request, and Defendants raised no objection. Having remained silent when the issue was before the Court, the FBI cannot now belatedly substitute a different search methodology based on arguments it never presented at the June 29 premotion conference. A Joint Status Report is not a vehicle for revisiting or narrowing the scope of the Court's prior order.

Plaintiff categorically rejects Defendants' characterization of his October 19 memorandum memorializing the parties' October 16 meet-and-confer as five pages of "discovery requests." Because that memorandum was expressly designated as a settlement communication pursuant to Fed. R. Evid. 408, Plaintiff does not attach it here. Plaintiff would, however, readily provide the memorandum to the Court if requested.

In any event, Plaintiff respectfully submits that the substance of Plaintiff's communications reflects a good-faith effort to understand and evaluate the FBI's supplemental searches, not to pursue discovery. Among other things, Plaintiff sought clarification regarding the scope and nature of those searches, including whether the FBI actually conducted

supplemental searches for certain categories of records or merely reported the results of searches performed previously. Such questions are directly relevant to assessing the adequacy of the FBI's search efforts and cannot fairly be dismissed as "discovery requests" simply because they seek clarification of the FBI's representations.[10] And had Defendants engaged in good faith, its responses would have furthered the goal of determining whether further litigation can be avoided.

Finally, Defendants appear to use this status report to renew their request for summary judgment.[11] Plaintiff objects. A joint status report is not the proper vehicle for resolving summary judgment issues. More importantly, genuine disputes of material fact remain regarding the adequacy of the FBI's search efforts and the propriety of its withholdings.

Plaintiff nevertheless remains hopeful that this case can be resolved without further motion practice. To that end, Plaintiff remains willing to continue meeting and conferring in an effort to resolve his outstanding questions and narrow any remaining disputes. Plaintiff respectfully submits that—perhaps with the Court's encouragement—the FBI may also be willing to return to the negotiating table and reach a resolution that obviates the need for further briefing. However, should the Court determine that the parties must proceed to summary

[10] Notably, when Plaintiff's counsel raised these questions during the October 16, 2026 meet-and-confer, Defendants' counsel agreed that the appropriate next step was for Plaintiff to submit them in writing so that counsel could consult with the FBI and provide responses. Defendants never suggested that the questions were improper, irrelevant, or beyond the scope of further meet-and-confer efforts. It was only in this Joint Status Report that Defendants reversed course, characterizing the inquiries as inappropriate and refusing to answer them.

[11] In support of its position, the FBI emphasizes that it has submitted seven declarations in this case. That fact, standing alone, carries little weight. Throughout this litigation, Plaintiff has repeatedly identified significant errors, omissions, and inaccuracies in the FBI's declarations, necessitating corrections and additional explanations. *See* ECF No. 48 at 6-8 & ECF No. 48-1 (Fourth Declaration of George G. Kouros) at ¶¶ 29-142. Indeed, absent Plaintiff's unusual access to unredacted comparator records, many of those errors would likely have gone undetected. The relevant question is therefore not how many declarations the FBI has submitted, but whether those declarations have adequately and accurately discharged the FBI's obligations under FOIA. (Indeed, even now, after seven sworn declarations insisting that its redactions were proper, the FBI has belatedly released additional information from the same records, implicitly conceding that its earlier withholdings were not justified.) Plaintiff respectfully submits that substantial questions remain.

judgment, Plaintiff respectfully requests that the matter be addressed through formal motion practice and full briefing, rather than by way of the Joint Status Report. Such a process would ensure that the parties have a fair opportunity to address the factual and legal issues bearing on any dispositive ruling.

Dated: November 3, 2026

*s/ Kimberly Paige Newberry*
KIMBERLY PAIGE NEWBERRY
Assistant Federal Public Defender
Bar ID No. 1011065 (Florida)
Federal Capital Habeas Project
Federal Public Defender
Eastern District of North Carolina
150 Fayetteville Street, Suite 450
Raleigh, NC 27601
Telephone: (301) 310-9399
Kimberly_Newberry@fd.org

*/s/ George G. Kouros*
GEORGE G. KOUROS
Assistant Federal Public Defender
Bar ID No. 420813 (Connecticut)
Federal Capital Habeas Project
Federal Public Defender
Eastern District of North Carolina
150 Fayetteville Street, Suite 450
Raleigh, NC 27601
Office: (301) 821-0855
George_Kouros@fd.org

*Attorneys for Plaintiff Jonathan Kagan-Kans*

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

*/s/ Zachary J. Krizel*
ZACHARY J. KRIZEL,
Ill. Bar #6346175
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
Telephone: (202) 252-2518
Zachary.Krizel@usdoj.gov

*Attorneys for the United States of America*